1

2

3

4

5

6

7

8          **IN THE UNITED STATES DISTRICT COURT**

9

10                **FOR THE DISTRICT OF ARIZONA**

11

12   **Bryan Crumly,**                    )          **No. CV-08-674-TUC-RCC-CRP**
                                          )
13                        **Plaintiff,**  )
                                          )
14   **vs.**                              )          **REPORT AND RECOMMENDATION**
                                          )
15                                        )
                                          )
16                                        )
17   **Michael J. Astrue, Commissioner of** )
     **Social Security,**                 )
18                                        )
                                          )
19                        **Defendant.**  )
                                          )
20   _____

21

22          Plaintiff brought this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of

23   a final decision by the Commissioner of Social Security ("Commissioner").      The

24   Commissioner denied Plaintiff's application for Supplemental Security Income ("SSI") under

25   Title XVI of the Social Security Act. 42 U.S.C. §§ 1382. Plaintiff requests this Court remand

26   without a hearing for an award of benefits or, in the alternative, remand for further

27   administrative proceedings. (Doc 10). Plaintiff alleges: (1) the Administrative Law Judge

28   ("ALJ") erred in failing to evaluate treating physician Dr. Barnett's opinion about Plaintiff's

sensitivity to loud noises or general opinion that Plaintiff is chronically disabled; (2) the ALJ erred in giving little credit to the lay witness testimony of Plaintiff's mother; (3) the ALJ erred in failing to evaluate Plaintiff's sensitivity to light; (4) the ALJ erred in evaluating the absence of treatment for organic brain damage; and (5) the ALJ erred in evaluating Plaintiff's activities. (Doc 10). The Commissioner contests Plaintiff's allegations. (Doc 11). Plaintiff replied to the Commissioner's response. (Doc 12). Based on the pleadings of the parties and the administrative record submitted to the Court, the Magistrate Judge recommends that the District Court, after its independent review, GRANT Plaintiff's Motion for Summary Judgment and REMAND this case to resolve the errors. (Doc 10).

## I. FACTUAL AND PROCEDURAL HISTORY

On May 31, 2005, Plaintiff applied for supplemental security income ("SSI") alleging disability beginning May 1, 2005. (Administrative Record ("AR") 55). The claim was denied initially on July 12, 2005 (based on insufficiency of evidence), and upon reconsideration on April 20, 2006. (AR 65, 72). Plaintiff then requested an administrative hearing which was held on March 21, 2007. (AR 85; Transcript at AR 9-48). After the ALJ denied Plaintiff's application for disability, Plaintiff appealed the decision. The Appeals Council denied Plaintiff's request for review on October 30, 2008 (AR 1) and Plaintiff subsequently filed the pending federal action. (Doc 1).

Plaintiff was born on December 30, 1972, making him 32 years old when he filed his application for SSI and 34 years old when the ALJ issued his decision. (AR 15, 64, 99). Plaintiff finished high school with generally low grades (AR 181-187) and two years of junior college without receiving a diploma. (AR 16). Plaintiff worked in various manual labor jobs, including as a fast food worker and construction laborer. (AR 118-119, 148-152). Earnings records show Plaintiff has never earned more than $5300.00 annually. (AR 110). In his most recent earnings, Plaintiff earned $1984.78 in 1995; in 1996, he earned $3913.00; and in 1997, he earned $895.63. (AR 110). Plaintiff has not earned income in over a decade.

(AR 110). His earnings records show no income since 1997. (AR 110). The ALJ found Plaintiff had no past relevant work based on his lack of earnings. (AR 63).

## A. Plaintiff's Headaches

The record shows Plaintiff's alleged disability derives most significantly from chronic headaches. At step two in the social security disability framework, the ALJ found Plaintiff suffered from severe impairments of headaches; organic brain damage; and substance abuse disorder. (AR 57). Plaintiff contends the headaches are the result of multiple head traumas. Plaintiff's treating physician, Dr. Brad Barnett, and Plaintiff's neurologist, Dr. David Lippincott, both found Plaintiff suffered from chronic headaches associated with closed head injury/head trauma which resulted in organic brain syndrome. (AR 333, 314). Plaintiff reported to examining psychologist Jill Caffrey, Ph.D. and testified at the administrative hearing about four separate incidents in which he suffered injuries to his head including incidents in 1987, 1993, 1994, and 1999. (AR 280, 24-25). The record contains documents relevant to three of those four alleged incidents, with no record for the alleged injury in 1994. (AR199; 243; 320-325).

Plaintiff and his mother allege physical abuse by Plaintiff's father when Plaintiff was a child. In a modification of custody order from an Iowa state court in 1987, the judge found Plaintiff's father physically struck Plaintiff on the head on at least two occasions after Plaintiff broke school rules. (AR 190). The Court modified the custody arrangement, giving custody to Plaintiff's mother, in part, because of the allegations of physical abuse. (AR 199, 202). At the administrative hearing, Plaintiff testified that his father's physical abuse resulted in neurological trauma and that he went to the hospital. (AR 24). The custody modification order does not address whether Plaintiff needed medical treatment.

In September 1993, Plaintiff self-reported that he was hit on the head with a hammer. (AR 243). Doctors described a "contused scalp and small laceration." (AR 243). Plaintiff was "alert and oriented" with normal cranial and cerebellar functions. (AR 243). The cut on Plaintiff's head was a four inch wound that was closed with staples behind his ear. (AR

242). A Brain CT scan revealed no brain injury - the findings were "routine brain CT performed without contrast" and impression was "left scalp soft tissue swelling but no intracranial hemorrhage or fracture." (AR 253). At the evidentiary hearing, Plaintiff testified that he needed 160 to 180 staples in the back of his head as a result of the injury. (AR 24). It is unclear from the record how many staples were needed to close the four inch wound on Plaintiff's scalp described by doctors as a small laceration. The record does state that the staples were removed from behind Plaintiff's left ear, with minimal bleeding and without difficulty. (AR 242).[1]

In November 1999, Tucson fire department records show that Plaintiff was involved in an assault. (AR 311-312). At the emergency department, doctors diagnosed him with a broken finger and laceration on his elbow. (AR 320). Plaintiff tested negative for any signs of head trauma; although, Plaintiff did suffer superficial lacerations to his scalp. (AR 320-321). Plaintiff initially stated that he was assaulted with a "mag light" but later said it may have been a glass bottle. (AR 320, 324- 325).

Medical records show Plaintiff has sought treatment for chronic headaches and that medical professionals observed characteristics common to organic brain damage and the associated chronic headaches. Plaintiff's examining doctor, Denny Peck, Ph.D., described Plaintiff as behaving "like a recalcitrant, inappropriate, immature child with adolescent authority problems." (AR 354). Dr. Peck found Plaintiff's behavior "definitive because this behavior is routinely seen with closed head traumas and while distressing for people who have to interact with [Plaintiff] is 'normal' brain damage behavior." (AR 354). In treatment notes, Plaintiff's treating physician observed similar behavior and found Plaintiff "functioning at perhaps a teenage level"; described Plaintiff, in another visit, as "of borderline intelligence"; and, in another visit as "acts rather young for his age." (AR 334,

---

[1] At the administrative hearing, Plaintiff also alleged another incident in which he had 150 to 180 staples placed in his head. (AR 24). There is no evidence in the record of this incident.

333).  The record also shows Plaintiff missed appointments to repack peri-rectal abscesses and lost the prescription for antibiotics.  (AR 332).  Plaintiff also failed to initially set up an appointment with the neurologist to whom his treating physician referred him and missed numerous appointments with his chiropractor.  (AR 334, 309).

Plaintiff has consistently complained of chronic headaches.  At the administrative hearing, Plaintiff told the ALJ that he has headaches every day but that the severity changes.  (AR 22).  In an undated Headache Questionnaire, Plaintiff stated he had headaches on a daily basis but that the headaches vary in intensity.  (AR 172).  Plaintiff began seeing his treating physician in January 1999 for complaints of chronic headaches.  (AR 334).  Neurologist Dr. Lippincott noted in March 1999 that Plaintiff "continues to have headaches on a daily basis."  (AR 313).  In December 1999, Plaintiff complained to treating physician Dr. Barnett of headaches twice a week.  (AR 333).  Later, in August 2002, Plaintiff saw Dr. Barnett complaining of intermittent headaches that "have been flaring up recently."  (AR 264).  The treatment notes show Plaintiff saw Dr. Barnett in October and December of 2002 and July 2005 complaining of chronic headaches.  (AR 263, 262).

Plaintiff provided evidence that different environmental factors can induce and/or aggravate his headaches.  Plaintiff told the ALJ that stress; bright lights and noises make his headaches worse.  (AR 22).  Plaintiff testified that bright light like sunlight triggers his headaches.  (AR 25).  When asked by his attorney whether the lights at the hearing bothered him, Plaintiff said "[y]es, fluorescent usually bothers me, unless it's really soft."  (AR 25).  Plaintiff stated that he uses dark (black out) curtains to block out the light in his home.  (AR 25).  Plaintiff further testified that loud noises, screeching, whining, and babies crying give him headaches.  (AR 26).  In an undated Adult Disability Report, Plaintiff stated that bright lights and stress intensify headaches.  (AR 117).  He also testified that he has temper and memory problems as well as a constant ringing in his ears.  (AR 26-27, 28).

Plaintiff's mother also described light and noise as triggers to Plaintiff's headaches.  (AR 129).  At the evidentiary hearing, Plaintiff's mother stated that Plaintiff keeps his home

dark and prefers only 40 watt light bulbs. (AR 35). She testified that she "painted all the walls like a dark brown for him to keep it so it wasn't so bright for him. And then I got him the blackout curtains. He hardly turns on his lights." (AR 35).

To treat his chronic headaches, Plaintiff takes some form of the medication butalbital.[2] In his first visit with his treating physician in January 1999, Plaintiff reported that he took butalbital in the past for his headaches. (AR 334). Plaintiff reported to neurologist Dr. Lippincott, in March 1999, that he takes butalbital for his headaches frequently, but not more than six to eight times per week. (AR 313). In his treatment notes, treating physician Dr. Barnett, consistently remarked that Plaintiff takes butalbital for his headaches. (AR 333-334, 262-264). Plaintiff told Dr. Barnett that his headaches improve "as long as [I] take[] Butalbital and Elavil as prescribed." (AR 333). Plaintiff reported to Dr. Barnett in July 2005 that he continued to use Butalbital for his headaches. (AR 262).

Based on the evidence in the record, Plaintiff does have significant side effects from the medication butalbital. One of Plaintiff's ongoing side effects from the medication is irregular sleeping patterns. At the administrative hearing, Plaintiff described an occasion on which he took the medication at 11:00 p.m. and did not wake up until 1:00 p.m or 3:00 p.m. the following day. (AR 26). In the undated Adult Function Report, Plaintiff reported "sometimes I sleep for 12 - 20 hours straight[;] sometimes I can't sleep for 36+ hours[;] meds affect my sleep cycles" (AR 133). In the December 2005 Function Report, Plaintiff described it as "my sleeping pattern is irratic [sic] sometimes I've been known to sleep 15-20 hours when under meds." (AR 155). Responding to a question about whether Plaintiff's condition affects his ability to sleep, Plaintiff's mother stated "[h]e sleeps up to 24hrs straight

---

[2]Butalbital is prescribed as a packaged drug containing caffeine and acetaminophen or aspirin and sometimes, codeine. *See* The American Society of Health-System Pharmacists, Inc., *United States National Library of Medicine, Medline Plus*, http:www.nlm.nih.gov/medlineplus/druginfo/meds/a601009.html, (Last Reviewed September 1, 2008). A copy of this web page is attached to this report and recommendation. The record does not clarify which form of the medication Plaintiff takes.

or can't sleep at all." (AR 125). In the headache evaluation form, Plaintiff claimed that he has no warnings of the oncoming headaches and that they cause irregular sleeping patterns and nausea. (AR 172).

Plaintiff's ability to drive and overall ability to function on his own is also dependent on whether he takes butalbital. Plaintiff stated that his ability to drive, ability to follow directions and interact with people depends on whether he is on the medication. (AR 137, 117). At the evidentiary hearing, Plaintiff testified that he cannot drive due to his medications (AR 16). He testified that he put less than 500 miles on his car in the last two years. (AR 21). Plaintiff did state he drives himself to doctor appointments and to the grocery store when he does not have headaches. (AR 21). Plaintiff stated that he drives himself, except when he is on the medication. (AR 135). When asked by the ALJ at the administrative hearing if there was anything Plaintiff could take to alleviate his headaches, Plaintiff said "[m]y medicine usually works, but it makes me pass out. I get nauseous sometimes when I take it..." (AR 22).

When on the medication for his headaches, Plaintiff's mother stated that Plaintiff is forgetful, does not want to be around people and his temper flares. (AR 127, 129). Plaintiff's mother stated that Plaintiff needs assistance when his head hurts and he takes his medicine. (AR 128). Plaintiff's mother described the effect of his medication, "Bryan is depress [sic] he wants to be left alone + [sic] doesn't like to leave his house. He get angry when his head hurts. When on medication he forgets things + [sic] can sleep 20 to 24 hours straight." (AR 131). When asked on the disability function report about how well Plaintiff can follow written and spoken instructions, Plaintiff's mother responded "not at all on medicine." (AR 129).

The office manager for First Chiropractic where Plaintiff received treatments for over ten years stated that Plaintiff would arrive for care and "his mental state would be groggy and somewhat disoriented." (AR 309). When office staff inquired into his grogginess, Plaintiff would state he "had not slept well and had taken medication." (AR 309). The office

manager further stated "[o]n some occasions he would be totally mentally clear and conversant (on a couple of visits he had even picked up candy for the staff), but typically he was groggy and sullen." (AR 309).

Plaintiff's daily activities are limited by his headaches. Plaintiff stated he played Dungeons and Dragons every Friday unless his head hurts and he takes his medication. (AR 136). At the administrative hearing, the ALJ asked Plaintiff how often his mother came to his house to see him and Plaintiff responded that it depended on his headaches. (AR 20-21). He said "[d]epending on my – if I have a headache, how bad my headaches are, whether or not I can drive. It varies." (AR 21). The ALJ also asked Plaintiff if he drove and Plaintiff testified that he drove "very little" but would drive to doctor's appointments and get groceries "when [his] head is okay." (AR 21). Plaintiff stated that he feels antisocial and tries to stay away from people when his head hurts. (AR 137). At the administrative hearing, Plaintiff answered "yes" when the ALJ asked if he spent most of his time at home by himself. (AR 20). Plaintiff's mother testified to Plaintiff's limited activities. She stated "I try to get him to go out once a week, which I'm lucky if I get to get him out of the house once a month." (AR 32). Plaintiff's mother further testified that she used to get him out of the house once a month but that "[l]ately it's been real hard to get him out. I'd say about three months in between." (AR 34). The ALJ did not ask Plaintiff how often Plaintiff has headaches that are so severe that he must take medication and limit his activities.

Plaintiff's daily activities when he does not have a severe headache requiring medication are less limited. When asked about his daily activities during the administrative hearing, Plaintiff stated that he read, played Dungeons and Dragons and computer games, watched television and listened to the radio. (AR 18). When completing an Adult Function Report in December 2005, Plaintiff described his daily routine as "[d]epends on the day[,] usually wake up[,] shower[,] clean then eat. Once every 2 weeks I go grocery shopping. Most day [sic] I watch tv or play video games or listen to the radio. I eat about 2 times a day[,] sometimes 3[,] then I go to bed & do it all over again the next day." (AR 154). In the

same Function Report, Plaintiff responded that he was able to watch tv, play video games and listen to the radio everyday with "fairly good results". (AR 158). He also described sweeping, mopping and doing laundry indoors and weedwacking outdoors; he stated these things take 1 -2 hours a day. (AR 156). In another undated Adult Function Report, Plaintiff described his Sunday activities as "laundry all day and sweep [and] mop floors after breakfast[;] watch tv, cook, read, play Nintendo/pc games & take medicine when head hurts." (AR 132).

Plaintiff's mother stated that Plaintiff's daily activities include reading, cooking food, watching television and doing a little house cleaning. (AR 124). Plaintiff's mother stated he only does activities like reading, watching television and computer games when his head is not hurting. (AR 128). Plaintiff's mother also stated that "depression makes [Plaintiff] not take [a bath]" and not care for his personal hygiene. (AR 125). Also, "[d]epression makes him want to be isolated ..." (AR 125). Plaintiff's mother stated that Plaintiff goes out once or twice a month. (AR 127). She also stated that she spends two to four hours a week with Plaintiff - taking him to get groceries and going out to eat. (AR 124; 32). When his head does not hurt, Plaintiff has game night once a week and he goes out to get his own groceries. (AR 127-128). Plaintiff testified at the administrative hearing that his mother lives around the block but that he does not go over to see his mother unless she needs him to do some chore for her or she brings him groceries when he has headaches. (AR 20-21). When asked if Plaintiff experienced changes in his social activities due to his conditions, Plaintiff's mother answered "yes[;] personal hygiene [sic], doesn't want to leave his house + doesn't want to be around people." (AR 129).

**B. Plaintiff's Alcohol and Drug Use**

Plaintiff's reports regarding his alcohol and marijuana use are inconsistent in the record. In an interview with Dr. Denny Peck, a psychologist hired by Plaintiff, Plaintiff stated he drank only on holidays or birthdays and limited his intake to one beer. (AR 349). At the administrative hearing, Plaintiff reported that he had not had a drink in six weeks or

six months. (AR 31). He explained to the ALJ that the last time he drank was when his friends stopped by for the night and he had three or four beers. (AR 31). When asked when the last time was that he had marijuana, Plaintiff said it was the same time as the beer, when his friends came over. (AR 31). Earlier in the hearing, the ALJ asked Plaintiff if he was still using marijuana; Plaintiff responded "[o]nly if someone offers it to me." (AR 19). In the treatment notes of his treating physician, Dr. Barnett noted moderate alcohol intake and moderate marijuana use in July 2005. (AR 263). When examined by Dr. Jill Caffrey in April 2006, Plaintiff told her that he last used drugs about 10 to 12 years ago. (AR 281).

## C. Treating Physician's Notes and Opinions

Plaintiff's treating physician, Dr. Bradley Barnett, has opined that Plaintiff is disabled. Dr. Barnett treated Plaintiff with some consistency between January 1999 and July 2005. There are gaps in the treatment records, with no treatment notes between January 2000 to July 2002 and January 2003 to June 2005. The following is a summary of Dr. Barnett's treatment notes for Plaintiff:

> January 1999 - In the first visit, Plaintiff's main complaint was chronic headaches. (AR 334). Plaintiff's mother wrote Dr. Barnett a letter explaining that Plaintiff was almost beaten to death by his father. (AR 334). Plaintiff presented to Dr. Barnett as alert and cooperative but functioning at a teenage level. (AR 334).

> March 1999 - Dr. Barnett opined that Plaintiff is borderline intelligence. (AR 334). Dr. Barnett noted that Plaintiff had missed two appointments and failed to follow up with a neurologist to whom Dr. Barnett had referred him.

> July 1999 - Plaintiff saw Dr. Barnett for follow up on his headaches. (AR 333). He reported that his headaches had improved as long as he takes Butalbital and Elavil as prescribed. (AR 333). Dr. Barnett observed that Plaintiff was alert and cooperative and the neurologic exam was normal. (AR 333). Dr. Barnett recommended continuing the same medication, discussed a healthy lifestyle with Plaintiff and recommended regular exercise and weight management. (AR 333).

> December 1999 - While at the doctor's office for another medical issue, Plaintiff stated that he has headaches a couple times a week. (AR 333). Plaintiff stated he did not feel any worse headaches, although he did suffer from frequent headaches. (AR 333). Plaintiff denied dizziness, visual changes

or other neurological impairments. (AR 333). The impression of Plaintiff by medical staff was that he "acts rather young for his age" (AR 333).

August 2002 - Plaintiff saw Dr. Barnett for a follow up on his headaches. (AR 264). Dr. Barnett stated that Plaintiff gets [headaches] intermittently but they have been flaring up recently. Patient has a history of multiple closed head injuries and uses butalbital for his headaches. Denies any vision change, vomiting, weakness, numbness or other new changes in his neurologic status. (AR 264). Plaintiff was again alert and cooperative and his neurologic exam was normal. (AR 264). Dr. Barnett noted the chronic headaches and stated weight gain may be part of worsening headaches. "He is followed by neurology. I have asked him to reduce his salt and caffeine intake, keep a diary of his headaches and come back in 6 weeks. He will call me sooner if he has any new neurologic symptoms at all; or he can follow-up with his neurologist." Dr. Barnett also filled the butalbital prescription and opined that some of headaches were migraines. (AR 264).

October 2002 - Plaintiff had appointment for chronic headaches. Dr. Barnett noted history of multiple head injuries which result in the headaches. Dr. Barnett filled out disability paperwork, opined that Plaintiff was chronically disabled. (AR 263). Plaintiff presented as alert and cooperative. Dr. Barnett noted that Plaintiff will try Inderal. (AR 263).

December 2002 - Dr. Barnett opines that Plaintiff has organic brain syndrome (OBS) from multiple closed head injuries. (AR 263). He notes that Plaintiff tried Inderal but could not tolerate it. (AR 263). "He continues to have fairly frequent headaches." (AR 263). Plaintiff presented as alert and cooperative with a neurologic exam that was "[n]on focal and grossly norm". (AR 263). For treatment, Dr. Barnett stated "[a]s far as the headaches, he will call if they worsen, if he develops new neurologic [symptoms] or other complaints." (AR 263).

July 2005 - Dr. Barnett notes that he had not seen Plaintiff in several years. (AR 262). Plaintiff on butalbital. Plaintiff would like to be on anti-depressant. Just feels lack of energy. Plaintiff reported smoking one to two packs of cigarettes a day, moderate alcohol intake and moderate marijuana use. (AR 262). Plaintiff reported headaches/depression/anxiety. Dr. Barnett's in office neurologic exam is normal. (AR 262).

In October 2002 and then again, in October 2004, Dr. Barnett completed disability paperwork, stating Plaintiff was disabled. (AR 263, 328). The administrative record contains the October 2004 paperwork. (AR 328). On it, Dr. Barnett completed an Arizona General Assistance Disability form in which he opined that Plaintiff had a medical incapacity of dementia rendering him unable to perform substantial gainful activity. (AR 328). Dr. Barnett has also requested special housing for Plaintiff to avoid loud noises. In a July 2003

letter to an unnamed person dealing with housing, Dr. Barnett requested his patient be allowed to "rent living space from his parents so that he can avoid loud noises and other distractions." (AR 327).

At the evidentiary hearing, Plaintiff's attorney stated that there were updated medical records from Dr. Barnett but that she had not received them yet from his office. (AR 13). The ALJ left the record open so that Plaintiff could supplement the record with those medical records. (AR 13, 47). In his decision denying benefits, the ALJ noted a lack of ongoing medical care and stated that while he left the record open for Plaintiff to submit additional medical records, none were submitted. (AR 61).

In the spring of 1999, Plaintiff's treating physician had him neurologically evaluated. Dr. David Lippincott, D.O. completed the neurological evaluation of Plaintiff. Plaintiff presented to Dr. Lippincott as alert and oriented. Plaintiff complained of daily headaches. (AR 313). Plaintiff reported that he took amitriptyline 50 mg everyday and butalbital frequently (but not more than six to eight times per week). (AR 313). Dr. Lippincott found no new neurologic symptoms and found Plaintiff to be in generally good health. (AR 313). His impression was Plaintiff suffers from "chronic daily headache associated with a closed head injury". (AR 313). Dr. Lippincott recommended "continu[ing] present medication, MRI, PT..." (AR 314). An April 1999 MR Brain Scan returned a result of normal. (AR 239).

**D. Examining Psychologist's Report and Reviewing Physician's Report**

In April 2006, Dr. Jill Caffrey, Ph.D. examined Plaintiff on behalf of the Commissioner. (AR 280-283). She noted that Plaintiff took butalbital for headaches as needed. (AR 280). She did not inquire into how frequently Plaintiff experiences headaches requiring medication and therefore, did not determine how frequently Plaintiff takes butalbital. (AR 280-283). Plaintiff reported to Dr. Caffrey that his headaches depend on stress and also told her that depression is an issue for him. (AR 280). Plaintiff told Dr. Caffrey that he was anxious in public and "antisocial" with his headaches. (AR 280).

Plaintiff presented to Dr. Caffrey as slightly overweight, some personal hygiene issues, but an affect in full range and mood euthymic. (AR 281). Dr. Caffrey stated "[g]iven his self-report, I found Mr. Crumly more interpersonally appropriate than I expected." (AR 283). Dr. Caffrey noted that Plaintiff fully cooperated and made good effort but that he did the requested work at a high rate of speed with marked impulsivity. (AR 281).

On the Wechsler Adult Intelligence Scale (WAIS), an intelligence quotient test, Plaintiff performed in the average range. (AR 281). Plaintiff also completed a Beck Depression Inventory on which he received a 28, suggesting depressive symptomatology. Dr. Caffrey opined that Plaintiff would not be able to manage his own benefits. (AR 283). Dr. Caffrey did not expound on why she believed Plaintiff would be unable to manage his own benefits. (AR 283).

After examining Plaintiff and completing her own report, Dr. Caffrey completed a Medical Source Statement on Plaintiff's ability to do mental work related activities. (AR 285-290). Dr. Caffrey found Plaintiff did have conditions including dysthymia and headaches that would impose limitations for twelve continuous months. (AR 285). Dr. Caffrey found five moderate limitations:

- ability to maintain attention and concentration for extended periods;
- ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;
- ability to sustain an ordinary routine without special supervision;
- ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness;
- ability to set realistic goals or make plans independently of others.

(AR 285-290). She found nine mild limitations in:

- ability to understand and remember detailed instructions;
- ability to work in coordination with or proximity to others without being distracted by them;
- ability to make simple work related decisions;
- ability to complete normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;

- ability to interact appropriately with the general public;
- ability to accept instructions and respond appropriately to criticism from supervisors;
- ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes;
- ability to respond appropriately to changes in the work setting;
- ability to be aware of normal hazards and take appropriate precautions.

(AR 285-290). Dr. Caffrey did not state and it does not appear that she considered any effect of the medication butalbital on Plaintiff's potential limitations. (AR 280-290).

In April 2006, Dr. Jack Marks, a reviewing physician for the Commissioner, found the same five moderate limitations as Dr. Caffrey when reviewing Plaintiff's file. (AR 291-293). Dr. Marks acknowledged Dr. Caffrey's WAIS testing of Plaintiff and found "claimant is capable of low stress routine tasks with limited interpersonal demand." (AR 291-293). On a Psychiatric Review Technique form, Dr. Marks noted Plaintiff experienced affective disorder and substance addiction. (AR 295). Dr. Marks found Plaintiff had dysthymia (per CE) with symptoms of decreased energy. (AR 298).

**E. Plaintiff's Examining Doctors**

Plaintiff hired Dr. Denny Peck, Ph.D. and Dr. Thomas McCabe, Ph.D. to complete a comprehensive disability evaluation of Plaintiff. The evaluation included two clinical interviews, a collateral interview with his mother, a Minnesota Multiphasic Personality Inventory-2 test and a review of medical file. (AR 348-356). Dr. Peck completed the clinical interviews and Dr. McCabe conducted the testing. (AR 348).

Dr. Peck interviewed Plaintiff and found he presented as " an overgrown complaining, unhappy, disheveled individual who has difficulty answering direct questions." (AR 354). Dr. Peck opined that Plaintiff was combative and defensive when he perceived criticism. Plaintiff had difficultly answering questions and needed to be constantly refocused. (AR 348).

Drs. Peck and McCabe evaluated Plaintiff's ability to work in "an isolated work place away from others" and found "[t]he medications, documented by his physician in the file and

[by Plaintiff], headaches, documented in the file, by [Plaintiff] and collateral interview, working memory deficit, as documented by CE testing, and inability to respond to demands, as documented in the MMPI-2 definitive interpretation above, clearly substantiate the severe impairments even in a restricted, isolated environment." (AR 355). In support of their own conclusions, Drs. Peck and McCabe noted treating physician Dr. Barnett's diagnoses of organic brain syndrome secondary to closed head injuries and his opinion that Plaintiff was disabled as well as Dr. Caffrey's opinion that Plaintiff was incapable of handling his own benefits. (AR 355).

In the Psychiatric Review Technique Form, Drs. McCabe and Peck found marked and extreme limitations in the following:

- Marked to extreme on restriction of daily activities (Doctors noted that Plaintiff withdrawals, fatigue, sleep problems, daily headaches). (AR 343).
- Marked difficulties in maintaining social functioning (Doctors noted that Plaintiff does not go out much). (AR 343).
- Marked and extreme difficulties maintaining concentration, persistence, or pace (Doctors referenced WAIS III, medications).
- Doctors also noted three episodes of decompensation each of extended duration. (AR 343).

On the Mental Work Tolerance Recommendations, Drs. McCabe and Peck found Plaintiff suffered marked or extreme limitations in the following:

- Markedly limited in ability to understand and remember detailed instructions (Doctors noted the memory testing; multiple head injuries; headaches and narcotic medication Plaintiff was taking). (AR 344).
- Markedly limited in ability to carry out detailed instructions (Based on Plaintiff's memory impairment; multiple head injuries, medications). (AR 344).
- Markedly limited in ability to maintain attention and concentration for extended periods (Due to Plaintiff's memory impairments). (AR 345).
- Markedly limited in ability to perform activities within a schedule, maintain regular attendance, and be punctual. (Based on Plaintiff's severe sleep problems; malaise and fatigue; severe headaches related to head injuries.) (AR 345).
- Markedly limited in ability to sustain an ordinary routine without special supervision (As evidenced by Plaintiff's multiple impairments requiring supervision or he would sleep all day.) (AR 345).

- Markedly limited in ability to work in coordination with or proximity to others without being distracted by them. (Plaintiff's inability to function around people without being distracted).

- Markedly limited in ability to complete a workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without more than the normal rest periods. (Supported by Plaintiff's headaches, medication; fatigue; isolation/withdrawal). (AR 345).

- Markedly limited in ability to accept instructions and respond appropriately to criticism from supervisors. (Plaintiff responds to everyone as though they were his father who beat him and criticized him). (AR 346).

-Markedly limited in ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness (Based on collateral interview with mother. Plaintiff does not shower unless he has to and is not neat). (AR 346).

- Markedly limited in ability to set realistic goals or make plans independently of others. (Plaintiff has no direction and would sleep all day). (AR 346).

After evaluating Plaintiff, Drs. Peck and McCabe completed a Psychiatric Review Technique form and found Plaintiff met or exceeded the criteria for four different disorders as listed in the social security guidelines. (AR 338). They found Plaintiff met or exceeded the listings for 12.02 (organic mental disorder), 12.04 (affective disorders), 12.08 (personality disorders). (AR 338). They opined Plaintiff exhibited memory impairment, perceptual or thinking disturbances, disturbance in mood thus, meeting or exceeding listing 12.02. (AR 339). They opined Plaintiff exhibited emotional withdrawal and/or isolation with paranoid ideation (all related to organic brain injury) thus, meeting or exceeding listing 12.03. (AR 340). For 12.04, they found Plaintiff suffered from depressive syndrome supported by (pervasive loss of interest in almost all activities; sleep disturbance; decreased energy; feelings of worthlessness; difficulty concentrating or thinking; thoughts of suicide (but not plan and would not act on it); paranoid thinking. (AR 341). For 12.08, they noted Plaintiff suffered from oddities of thought, perception, speech and behavior; persistent disturbances of mood or affect. (AR 342).

In choosing not to offer a hypothetical to the vocational expert based on the limitations identified by Drs. Peck and McCabe, the ALJ stated that if the examining doctors' conclusions were taken into account, Plaintiff would meet a listing and be disabled at step three in the social security framework. (AR 41).

**F. The Conclusions of the Vocational Experts**

At the administrative hearing held on March 21, 2007, the ALJ requested the testimony of Staci Schonbrun, a vocational expert. (AR 37). The ALJ initially asked Ms. Schonbrun to consider three hypotheticals regarding Plaintiff's ability to work. (AR 39). The first hypothetical profiled the five moderate limitations identified by Dr. Caffrey. (AR 39). The second hypothetical was based on Dr. Marks' review of Plaintiff's record and was essentially the same as the hypothetical based on the limitations identified by Dr. Caffrey. (AR 40-41). The ALJ began to outline a third hypothetical based on the limitations identified by Plaintiff's examining physicians, Drs. McCabe and Peck but then noted that if the medical evidence supported the physicians' conclusions, Plaintiff would meet one of the disability listings in step three of the evaluation process. (AR 41). Thus, Ms. Schonbrun considered only the moderate limitations identified by Dr. Caffrey and reiterated by Dr. Marks. (AR 41-42).

Based on the limitations identified by Drs. Caffrey and Marks, including the five moderate limitations, Ms. Schonbrun opined that Plaintiff could sustain three jobs: a janitor, a night cleaner, or a dishwasher. (AR 42-43). Plaintiff's attorney asked Ms. Schonbrun what "moderately limited" meant to her, specifically she asked if "moderately limited" meant that Plaintiff could not perform based on his limitations thirty percent of the time, would he still be able to work. (AR 44). Ms. Schonbrun answered yes, Plaintiff could work with moderate limitations that impeded him in those areas thirty percent of the time but that the result would be different if those limitations impeded him fifty percent of the time. (AR 44). On questioning by Plaintiff's attorney, Ms. Schonbrun also acknowledged that all three jobs involved working in fluorescent light. (AR 44-45). Ms. Schonbrun was not asked about the level of noise in the three jobs. Nor was Ms. Schonbrun asked about the effect of missing a certain amount of work due to headaches as the ALJ did not determine how frequently Plaintiff has severe headaches requiring medication.

After the administrative hearing, Plaintiff requested David Goguen, another vocational expert, evaluate his ability to work.  Mr. Goguen reviewed Plaintiff's record including the medical reports, Plaintiff's statements, Plaintiff's mother's statements, and he listened to the recording of the administrative hearing.  (AR 204).  Mr. Goguen also interviewed Plaintiff.  (AR 204).  In his report, Mr. Goguen summarized the reports from Plaintiff's examining doctors, Drs. McCabe and Peck, as well as the Commissioner's examining doctor, Dr. Caffrey, and the reviewing doctor, Dr. Marks.  (AR 205-206).

Mr. Goguen focused on the five moderate limitations identified by Drs. Caffrey and Marks and chose not to address in detail the limitations identified by Drs. Peck and McCabe as the ALJ found Plaintiff would meet a listing if he followed the conclusions of those doctors.  (AR 210-211).  Mr. Goguen opined that the number of moderate limitations identified by Drs. Caffrey and Marks made it unlikely that Plaintiff could maintain employment.  (AR 213).  Mr. Goguen stated "[o]bviously greater limitations within the moderate range and the more moderate limitations that exist for a worker then the more likely it is that such a person would not reasonably be able to successfully meet the basic mental demands of competitive, remunerative, unskilled work."  (AR 211).  Mr. Goguen pointed out that critical to performing unskilled work is the ability to maintain attention for extended periods of two-hour segments and the ability to maintain regular attendance and be punctual within customary tolerances.  (AR 213).  Mr. Goguen opined that Plaintiff's multiple moderate limitations including the limitation to maintain a schedule could prevent him from successfully maintaining gainful employment in unskilled work.  (AR 213).  Mr. Goguen also noted that Plaintiff's moderate limitation in his ability to maintain regular attendance and be punctual within customary tolerances is a strict tolerance for unskilled work, meaning there is less flexibility of attendance and punctuality.  (AR 213).

**G.  The ALJ's Conclusions**

Subsequent to the administrative hearing, on August 24, 2007, the ALJ Peter J. Baum issued his opinion that Plaintiff was not disabled at step five because he could perform a

significant number of unskilled jobs. (AR 52-64). In his opinion at step two in the analysis, the ALJ did find that Plaintiff suffered from severe impairments of headaches, organic brain damage and substance use disorder. (AR 57). The ALJ also found Plaintiff's residual functional capacity was limited by Plaintiff's moderate limitations in the ability to sustain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, and set realistic goals or make plans independently of others. (AR 58). The ALJ found Plaintiff limited to unskilled work and also found that Plaintiff would work best in an environment requiring only brief, intermittent contact with the public or coworkers and that due to his medication, he should avoid working around hazards. (AR 58).

Regarding Plaintiff's headaches, the ALJ acknowledged Plaintiff is significantly affected by his headaches. The ALJ stated:

> headaches vary in severity and are made worse with stress, noise, and bright lights. Warnings for prescribed medicine include not driving or using machinery. As a result, he is unable to perform the construction work he used to do, as he used power tools on that job. Although the headache medicine works, it often causes him to sleep excessively and become nauseated, side effects he has reported to his physician. In addition to his headaches and adverse side effects from prescribed medication, he has had multiple head injuries resulting in memory problems so severe that he must often be reminded to do even routine daily chores and tasks. He has a driver's license but drives infrequently and only if he does not have a headache. He socializes infrequently even with his mother who lives just a block away. When he is around more than five to eight people, he sweats profusely and, at times, becomes angry.

(AR 59-60). Although the ALJ noted the significance of Plaintiff's headaches, he did not inquiry into how frequently Plaintiff has severe headaches that require he take butalbital to control them.

In reaching his decision, the ALJ found the record did not support Plaintiff's complaints about the severity and persistence of Plaintiff's alleged symptoms. (AR 59-60).

- 19 -

The ALJ found Plaintiff not entirely credible and gave little weight to Plaintiff's mother's lay witness testimony because the testimonies were not supported by the other evidence in the record. (AR 61-62). The ALJ also found that much of the medical evidence predated Plaintiff's alleged onset date of May 1, 2005, including most of the treatment notes and opinions from treating physician Dr. Barnett. (AR 60). The ALJ addressed the medical evidence presented by the Commissioner's examining and reviewing physicians and by Plaintiff's examining doctors but did not address the medical opinions nor much of the medical evidence offered from Plaintiff's treating physician, Dr. Barnett. (AR 60-62). Also, the ALJ gave the opinions of examining doctors Peck and McCabe little weight because their opinions were based, in part, on Plaintiff's testimony which the ALJ found not entirely credible and because the ALJ found Plaintiff did not seek ongoing medical care or take psychotropic medication regularly. (AR 62). The ALJ further gave substantial weight to the opinion of Drs. Caffrey and Marks but did not acknowledge that Dr. Caffrey opined Plaintiff would not be able to manage his own benefits. (AR 62).

## II. ANALYSIS

## A. Standard of review

The Commissioner's determination of Plaintiff's disability must be affirmed if it is supported by substantial evidence and the Commissioner applied the correct legal standards. *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir.2007) (internal citation omitted). The court may overturn the decision to deny benefits only if the decision "contains legal error or is not supported by substantial evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir.2007) (internal citation omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (internal citation omitted). The "evidence must be more than a mere scintilla but not necessarily a preponderance." *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 fn. 1 (9th Cir.2005) (internal citation omitted). Where there is more than one rational interpretation for the evidence, and the evidence can support either affirming or reversing the ALJ's conclusion, the reviewing court "may not substitute

1    [its] judgment for that of the ALJ" and the ALJ's decision should be upheld.  *Burch v.*

2    *Barnhart.*, 400 F.3d 676, 679 (9th Cir.2005) (internal citation omitted).

3            The Social Security Regulations establish a five-step sequential evaluation process for

4    determining whether a claimant is disabled.  20 C.F.R. § 416.920; *see also Heckler v.*

5    *Campbell*, 461 U.S. 458, 460-462 (1983).  The claimant bears the burden of proof in steps

6    one through four.  *Thomas v. Barnhart*, 278 F.3d 947, 955 (9th Cir.2002).  To establish

7    disability, the claimant must show he (1) is not working; (2) has a severe physical or mental

8    impairment; (3) the impairment meets or equals the requirements of a listed impairment; or

9    (4) claimant's residual functional capacity ("RFC") precludes him from performing his past

10   work.  *Hoopai*, 499 F.3d at 1074-1075 (internal citations omitted).  At step five, the

11   Commissioner bears the burden of proof and must show that the claimant has the RFC to

12   perform other work that exists in substantial numbers inn the national economy.  *Id*. at 1074.

13   If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point

14   in the five-step process, he does not proceed to the next step.

15           A step five determination is made on the basis of four factors: the claimant's RFC,

16   age, education and work experience.  *Id.*  "To assist in the step-five determination, the Social

17   Security Administration established the Medical-Vocational Guidelines (the grids), which

18   consist of a matrix of [the four factors] and set forth rules that identify whether jobs requiring

19   a specific combination of these factors exist in significant numbers in the national economy."

20   *Hoopai*, 499 F.3d at 1075 (internal citation omitted).  "When the grids match the claimant's

21   qualifications, the guidelines direct a conclusion as to whether work exists that the claimant

22   could perform."  *Hoopai*, 499 F.3d at 1075 (internal citation omitted).  "When the grids do

23   not match the claimant's qualifications, the ALJ can either (1) use the grids as a framework

24   and make a determination of what work exists that the claimant can perform, *see* SSR 83-14,

25   or (2) rely on a vocational expert when the claimant has significant non-exertional

26   limitations."  *Hoopai*, 499 F.3d at 1075 (internal citation omitted).

27

28

**B. Discussion of Alleged Errors**

**1. The ALJ failed to evaluate treating physician Dr. Barnett's opinion about Plaintiff's sensitivity to loud noises or general opinion that Plaintiff is chronically disabled**

Plaintiff asserts the ALJ erred in not providing clear and convincing reasons for rejecting the opinion of Plaintiff's treating physician, Dr. Barnett, that Plaintiff had sensitivity to loud noises and that Plaintiff was "chronically disabled." (Doc 10-2, p 4). The Commissioner contends the ALJ was permitted to disregard Dr. Barnett's opinions because they were offered prior to Plaintiff's alleged date of disability; the opinion that Plaintiff is disabled is a determination that the ALJ ultimately makes; and, it is harmless error if the ALJ should have incorporated Plaintiff's alleged noise sensitivity into the hypotheticals offered to the vocational expert at the administrative hearing. (Doc 11, pp 3-4).

In *Lester v. Chater*, the Ninth Circuit outlined the standard for reviewing the opinions of physicians:

> Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians). As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant. At least where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons. [...] Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record for so doing.

*Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.1995) (internal citations and references omitted). The federal regulations provide, as a general rule, that more weight is given to treating physicians' opinions as opposed to non-treating physicians. 20 C.F.R. § 416.927(d). More weight is given to treating physicians because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [Plaintiff's] medical impairment(s) ..." 20 C.F.R. § 416.927(d). In determining the weight of a treating physician's opinions, the regulations require the SSA to consider the length of the treatment

- 22 -

relationship and frequency of examination; the nature and extent of the treatment relationship; the supportability of the physician's opinions; the consistency of the opinion with the record; and any specialization of the physician and other factors. 20 C.F.R. § 416.927(d)(2).

Specific to doctors opinions on matters reserved to the Commissioner, such as an ultimate decision on disability, the Social Security Regulations provide "opinions from any medical source about issues reserved to the Commissioner must never be ignored, and that the notice of the determination or decision must explain the consideration given to the treating source's opinion(s)." SSR 96-5p, *see also* 20 C.F.R. § 416.927(e). With that said, opinions from medical sources about issues reserved to the Commissioner are never entitled to controlling weight or special significance. SSR 96-5p.

In the case before this Court, the ALJ did not consider Dr. Barnett's treatment notes or opinions. Instead, the ALJ discounted the medical evidence from Dr. Barnett as pre-dating Plaintiff's alleged onset date of May 1, 2005. It is insignificant that much of medical evidence from Dr. Barnett predates May 2005. Plaintiff's alleged disability derives mainly from chronic headaches secondary to his organic brain damage. The ALJ does not dispute that Plaintiff experiences the headaches secondary to brain damage. At step two, the ALJ found severe impairments of headaches and organic brain damage. These impairments are not temporary or transient medical conditions. Dr. Barnett's treatment notes from January 1999 through July 2005 and his opinions about Plaintiff's disability and noise sensitivity directly relate to the severity and persistency of these ongoing medical impairments, specifically the chronic headaches. The ALJ erred in discounting, without reason, the medical evidence and opinions from Dr. Barnett. This medical evidence by itself is an important consideration in determining Plaintiff's alleged disability.

The medical evidence also provides significant support for Plaintiff's credibility and his mother's credibility as to the severity of his symptoms. Dr. Barnett's treatment notes are evidence of the consistency and severity with which Plaintiff experienced the headaches.

They show that Plaintiff saw Dr. Barnett over a six year period with some consistency complaining of chronic headaches. Dr. Barnett diagnosed Plaintiff with organic brain damage and with chronic headaches secondary to the brain damage. He prescribed butalbital to Plaintiff for the headaches as well as other medications that worked less effectively. From the treatment notes it is evident that Dr. Barnett treated Plaintiff's complaint of chronic headaches seriously and found those headaches to be a serious ailment.

The ALJ also erred in failing to evaluate Dr. Barnett's opinion, offered twice, that Plaintiff is disabled. After treating Plaintiff for the chronic headaches for over a year and a half, in October 2002, Dr. Barnett completed a state disability form opining that Plaintiff is chronically disabled. (AR 263). The record also contains another disability form completed by Dr. Barnett in October 2004, in which Dr. Barnett opined that Plaintiff is disabled. (AR 328). Under the regulations, the ALJ was not required to give Dr. Barnett's opinion about Plaintiff's disability controlling weight or special significance. The ALJ, however, could not ignore this opinion. The ALJ was obligated to address this opinion and explain the consideration he gave it.

The ALJ also erred in failing to address Dr. Barnett's opinion that Plaintiff was sensitive to loud noises. In the a July 2003 letter, to an unnamed person dealing with housing, Dr. Barnett requested his patient be allowed to "rent living space from his parents so that he can avoid loud noises and other distractions." (AR 327). The treatment notes do not reflect that Plaintiff had a sensitivity to loud noises but Plaintiff did testify at the administrative hearing that loud noises exacerbate his headaches and he also noted this sensitivity in other parts of the record. The letter written by Dr. Barnett in July 2003, is evidence that Plaintiff is sensitive to loud noises and supports Plaintiff's own testimony about this fact. In his decision, the ALJ noted that Plaintiff's headaches are made worse with "stress, noise, and bright lights" but the ALJ did not address how that information effected his ultimate decision on Plaintiff's disability and significantly, how it effected Plaintiff's ability to perform the jobs identified by the vocational expert at the administrative hearing.

The ALJ should have evaluated Dr. Barnett's opinion requesting that Plaintiff avoid loud noises.

The ALJ erred in failing to evaluate the opinions of Dr. Barnett. The record contains fairly extensive treatment notes from Dr. Barnett, two opinions from Dr. Barnett about Plaintiff's alleged disability, and an opinion about Plaintiff's sensitivity to loud noises. The ALJ was obligated to evaluate this evidence and then provide, at a minimum, specific and legitimate reasons for dismissing these opinions.

## 2. The ALJ erred in evaluating Plaintiff's mother's statements

Plaintiff asserts that the ALJ erroneously rejected the lay-witness statements of Plaintiff's mother. Commissioner argues the ALJ gave germane reasons for discounting Plaintiff's mother's testimony as it is inconsistent with the objective evidence in the record.

Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so. *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir.1996) (*citing Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir.1993)). Lay witnesses including friends and family members of a claimant are in a position to observe a claimant's symptoms and daily activities. *Dodrill*, 12 F.3d at 918-919. "An eyewitness can often tell whether someone is suffering or merely malingering." *Id*. at 919. An ALJ can properly reject lay witness statements when there are inconsistencies between the statements and medical evidence and also when the statements describe symptoms that are not documented in claimant's medical records. *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir.2005); *Lewis v. Apfel*, 236 F.3d 503, 511-512 (9th Cir.2001).

In this case, the ALJ gave Plaintiff's mother's testimony little weight. The ALJ noted that Plaintiff's mother testified that Plaintiff "had a problem with anger, finds it difficult to be around people, and must be reminded constantly to do routine tasks, such as getting the

mail, taking out the trash, and handling his personal hygiene care." (AR 60). In giving Plaintiff's mother's testimony little weight, the ALJ stated:

The undersigned has evaluated and considered the written statement and oral testimony by the claimant's mother. She commented on his variable sleep pattern, poor grooming due to depression, and a preference to be alone. However, she also noted that her son engaged in a variety of daily activities including reading, shopping, cooking simple meals on a daily basis, and socializing weekly on "game night" (Exhibit 3F).

(AR 62).

The ALJ's decision to give the mother's testimony little weight is in error. The ALJ suggested Plaintiff's mother gave conflicting testimony because she described Plaintiff as not very functional with erratic sleeping, poor grooming and depression but then described him as engaging in a variety of daily activities. This testimony is not conflicting if viewed in its proper context. The proper context is whether or not Plaintiff is experiencing a severe headache and in need of medication. When on the medication for his headaches, Plaintiff's mother describes him as forgetful, anti-social with a temper that flares. (AR 127, 129). She must assist him when he takes the medication. (AR 128). Plaintiff's mother described the effect of his medication, "Bryan is depress [sic] he wants to be left alone + [sic] doesn't like to leave his house. He get angry when his head hurts. When on medication he forgets things + [sic] can sleep 20 to 24 hours straight." (AR 131). She also described Plaintiff as unable to follow written and spoken instructions when medicated. (AR 129). In contrast, but not conflict, Plaintiff's mother describes Plaintiff as more self-sufficient when he does not have a headache and is not taking medication. During those times, Plaintiff is able to read, watch television, cook, do some limited grocery shopping.

The other evidence in the record, including the medical evidence from Dr. Barnett, supports Plaintiff's mother's statements about the effect of severe headaches on Plaintiff. The ALJ erred in giving Plaintiff's mother's testimony little weight because it was allegedly in conflict with itself. In fact, Plaintiff's mother's testimony is supported by the substantial evidence in the record. All the evidence suggests that when Plaintiff is not experiencing

headaches, he is able to function on his own but he is not functional when he has a severe headache and takes his medication.

**3. The ALJ erred in evaluating Plaintiff's sensitivity to light**

Plaintiff contends that the ALJ failed to evaluate Plaintiff's light sensitivity. (Doc 10-2, p 8). The record contains multiple references to Plaintiff's alleged light sensitivity. Plaintiff states that light induces and aggravates his headaches. At the evidentiary hearing, Plaintiff testified that bright lights make his headaches worse and the sunlight triggers his headaches. (AR 22, 25). Plaintiff also testified that fluorescent light, unless it is a soft light also bothers him and that he uses dark (black out) curtains to keep light out of his home. (AR 25). In an undated Adult Disability Report Plaintiff also stated that bright lights aggravate his headaches. (AR 117). At the evidentiary hearing, Plaintiff's mother stated that Plaintiff keeps his home dark and prefers only 40 watt light bulbs. (AR 35). She testified that she "painted all the walls like a dark brown for him to keep it so it wasn't so bright for him. And then I got him the blackout curtains. He hardly turns on his lights." (AR 35).

Plaintiff argues the ALJ should have included his light sensitivity as a limiting factor in the hypotheticals given to the vocational expert. In his decision, the ALJ noted that noise was a factor which worsened Plaintiff's headaches. (AR 60). Yet, the ALJ did not ask the vocational expert about the effect of light sensitivity on Plaintiff's ability to work the three identified jobs. When asked by Plaintiff's attorney about the light involved in the three identified jobs, the vocational expert testified at the administrative hearings that all three of the jobs could require exposure to fluorescent light. (AR 44).

The Commissioner contends the ALJ properly found Plaintiff not entirely credible regarding his symptoms and that the ALJ was not required to specifically address Plaintiff's alleged light sensitivity. (Doc 11, p 6). The Commissioner further argues that the ALJ considered Plaintiff's daily activities, including "a considerable amount of time [] watching television and/or using the computer" as objective evidence discrediting Plaintiff's subjective complaints. (Doc 11, p 8; AR 62).

It is true the ALJ detailed Plaintiff's daily activities and rejected the severity of Plaintiff's complaints based on his "somewhat normal level of daily activity and interaction", but the ALJ did not specifically reject Plaintiff's credibility as to the light sensitivity.

To make a credibility determination of a claimant, an ALJ must give "specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p (explaining the regulatory framework for evaluating credibility as found in 20 C.F.R. § 416.929(c)). "Once the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence. [...] Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be 'clear and convincing'." *Lester*, 81 F.3d at 834 (internal citations omitted). General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints. *Dodrill*, 12 F.3d at 918.

Plaintiff's alleged sensitivity to light is significant evidence. The record shows Plaintiff consistently complained of light inducing and/or aggravating his headaches. The ALJ acknowledged that light increased the severity of Plaintiff's headaches. The light sensitivity is directly related to Plaintiff's chronic headaches, an impairment that the ALJ found severe at step two in the evaluation. The ALJ should have specifically addressed Plaintiff's light sensitivity and why it was or was not credible. If it was credible, the ALJ should have included light sensitivity as a limitation in his hypotheticals to the vocational expert.

**4. The ALJ erred in evaluating Plaintiff's medical treatment**

Plaintiff argues the ALJ erred in finding that Plaintiff failed to seek consistent medical

treatment for his impairment and in using that determination to weigh against Plaintiff's credibility and against the evaluations of Drs. Peck and McCabe. (Doc 10-2, p 9). The Commissioner contends the ALJ properly found Plaintiff did not seek treatment consistent with the alleged severity of his *symptoms*, not treatment for organic brain damage. (Doc 11, p 6). In his decision, the ALJ stated "[t]he severity of [Plaintiff's] subjective complaints is not supported by his lack of ongoing treatment and psychotropic medication." (AR 61). The ALJ further stated:

> Although the claimant testified to severe, unremitting symptoms, the record reflects that he has had little in the way of ongoing medical care seeking relief from his symptoms. While the record shows a history of alleged frequent headaches, the claimant has not seen any physician on a regular basis for ongoing treatment, despite having medical coverage through a State-funded program. The most recent record from the treating physician was in July 2005 (Exhibit 6F) . . . Although his attorney requested that the record remain open in order to submit update medical evidence from the treating physician, none was forthcoming. Had his symptoms been as debilitating and severe as he has alleged it is likely that the claimant would have sought treatment to a much greater degree than is evidenced in the record.

(AR 61).

Substantial evidence does not support the ALJ's finding on this issue. The record shows that Plaintiff did seek treatment for his chronic headaches and did consistently take medication for those headaches. Plaintiff somewhat consistently sought treatment from his treating physician, Dr. Barnett, from January 1999 through, at least, July 2005. (AR 333-334; 262-264). The record contains no treatment notes between January 2000 to July 2002 and January 2003 to June 2005 and no medical records after July 2005, even though Plaintiff was given the opportunity to supplement the record. While there are breaks in treatment, Dr. Barnett's treatment notes show that Plaintiff consistently complained of chronic headaches and that Dr. Barnett found Plaintiff's complaints valid. Dr. Barnett prescribed medications and completed two disability reports opining that Plaintiff was disabled due to his organic brain damage and resulting chronic headaches. Plaintiff consistently took the barbiturate butalbital for his severe headaches and reported to the neurologist that he took that medication as much as six to eight times a week. The ALJ erred in weighing Plaintiff's

alleged lack of treatment against Plaintiff's credibility and against the findings of Plaintiff's examining physicians Drs. Peck and McCabe.

**5. The ALJ erred in evaluating Plaintiff's daily activities**

Plaintiff asserts that ALJ erred in determining Plaintiff not entirely credible as to the severity of his symptoms because his daily activities were "somewhat normal." ((Doc 10-2, p 11; AR 62). The Commissioner argues the ALJ correctly considered Plaintiff's multiple reports of watching television and playing video games as evidence weighing against Plaintiff's complaints of light sensitivity and other alleged severe symptoms associated with his organic brain damage and chronic headaches. (Doc 11, p 8).

As one of many factors, an ALJ may consider a claimant's daily activities when weighing the claimant's credibility. *Thomas v. Barnhart*, 278 F.3d 947, 958-959 (9th Cir.2002). Daily activities that show a claimant is able to perform household chores and other activities similar to tasks involved in a type of job can weigh against a Plaintiff's credibility about the severity of his symptoms. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989). Such reasoning, however, has its limits. Home activities may "not [be] easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or taken medication." *Id.*

In this case, the ALJ erred in finding Plaintiff's daily activities did not support the alleged severity of his symptoms. The ALJ focused on Plaintiff's daily activities as described by Plaintiff and his mother when Plaintiff does not have headaches. Without a severe headache, Plaintiff's activities included watching television, playing video games, doing chores, going grocery shopping once or twice a week, etc. (AR 18, 124, 154, 156, 158). The problem with focusing on these activities is that Plaintiff seems to do none of them when he has a severe headache and takes his medication. Plaintiff stated that his ability to drive, ability to follow directions and interact with people depends on whether he is on the medication. (AR 137, 117). Plaintiff cannot drive himself places when he is taking the medication for his headaches. (AR 16, 135). Responding to a question about whether he

needed someone to accompany him when he goes places, Plaintiff stated "only when medicated." (AR 136). When on the medication for his headaches, Plaintiff's mother stated that Plaintiff is forgetful and his temper flares. (AR 129). Plaintiff's mother stated that Plaintiff needs assistance when his head hurts and he takes his medicine. (AR 128).

In considering the treatment notes of Dr. Barnett and Plaintiff's self-reporting of his headaches, it appears that Plaintiff's daily activities depend on the severity of his headaches and that Plaintiff appears to have severe headaches with frequency. Substantial evidence does not support the ALJ's decision. The ALJ erred in finding Plaintiff not entirely credible based on his daily activities.

## C.  Remedy

A federal court can affirm, modify, or reverse, with or without remand, a social security case. 42 U.S.C. § 405(g). When it may be necessary to obtain a vocational expert's testimony about the effect of additional limitations on a claimant's ability to work, remand is appropriate. *See Varney II*, 572 F.3d at 597 (In cases "where the testimony of the vocational expert has failed to address a claimant's limitations as established by improperly discredited evidence" the case should be "remanded for further proceedings rather than payment of benefits" *citing Harman v. Apfel*, 211 F.3d 1172, 1178-79 (9th Cir. 2000)). A reviewing court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that "the ALJ's error was 'inconsequential to the ultimate nondisability determination.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir.2006), *quoting Stout v. Comm'r. Soc. Sec. Admin.*, 454 F.3d 1050, 1055-1056 (9th Cir.2006). The errors in this case were not inconsequential.

In this case, the ALJ erred in (1) failing to evaluate the medical evidence and opinions of Plaintiff's treating physician, Dr. Barnett; (2) in giving little weight to Plaintiff's mother's testimony; (3) in evaluating Plaintiff's sensitivity to light; (4) in evaluating Plaintiff's medical treatment; and (5) in evaluating Plaintiff's daily activities. None of these errors was

harmless. These errors require this Court to remand the case back to the ALJ. This Court will address the remedies for each of the errors <u>infra.</u>

To remedy the ALJ's failure to consider Dr. Barnett's medical evidence, Plaintiff argues Dr. Barnett's opinions should be credited as a matter of law. There are two remedies where the ALJ fails to provide adequate reasons for rejecting the opinions of a treating or examining physician. The general rule, found in the *Lester* line of cases and cited by Plaintiff, is that "[courts] credit that opinion as a matter of law." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir.1996); *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.1990); *Hammock v. Bowen*, 879 F.2d 498, 502 (9th Cir.1989). There is, however, a Ninth Circuit split in authority as to whether the 'credit-as-true' rule is mandatory or discretionary. *Vasquez v. Astrue*, 572 F.3d 586, 593 (9th Cir.2009) (recognizing but declining to address the split in authority on whether the credit-as-true rule is mandatory or discretionary in context of a claimant's subjective pain testimony). The Ninth Circuit specifically chose not to address the issue of whether courts must apply the credit-as-true rule in cases where outstanding issues remain before a proper disability determination can be made. *Vasquez*, 572 F.3d at 593. Another approach found in *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir.1989), holds a court may remand to allow the ALJ to provide the requisite specific and legitimate reasons for disregarding the opinion.

In this case, outstanding issues remain before a disability determination can be made. The Court should not credit-as-true Dr. Barnett's opinions. Dr. Barnett opined that Plaintiff is disabled and significant treatment notes as well as other evidence in the record including Plaintiff's ongoing use of butalbital provide support for that position. However, there were some significant breaks in treatment with Dr. Barnett and it is unclear how frequently Plaintiff experiences headaches so severe he must take butalbital. Also, the ultimate decision on disability is reserved to the Commissioner. The ALJ erred in failing to evaluate the opinions of Dr. Barnett but further proceedings are appropriate. There may be evidence in the record to which the ALJ can point to provide the requisite specific and legitimate reasons

for disregarding the opinions of Dr. Barnett. Then again, there may not. In any event, the ALJ is in a better position than this court to perform the task. Remand is the appropriate remedy.

On remand, the ALJ must consider Dr. Barnett's treatment notes and then either accept his opinions or provide specific and legitimate reasons for rejecting Dr. Barnett's extensive treatment notes, Dr. Barnett's opinion that Plaintiff is disabled and his opinion that Plaintiff is sensitive to loud noises. These opinions must be considered together with the other substantial evidence in the record. The Court notes other evidence that the ALJ should specifically consider with Dr. Barnett's opinions including, Dr. Caffrey's opinion that Plaintiff cannot manage his own benefits, Drs. Peck and McCabe's opinion that Plaintiff was severely impaired, Mr. Goguen's opinion that Plaintiff's multiple moderate limitations foreclosed on Plaintiff's ability to work and the letter from Plaintiff's chiropractor office manager that Plaintiff appeared significantly impaired by his medication on many visits and missed multiple appointments. The testimony of Plaintiff and his mother should be considered as well.

The Court also recommends the ALJ be required to consider the effects of the medication taken by Plaintiff. Plaintiff's regular use of the medication butalbital is well-documented in Dr. Barnett's treatment notes. Yet, no discussion of the medication side effects nor the frequency with which Plaintiff takes this medication was discussed in the denial of disability. Butalbital is a barbiturate that causes significant side effects including but not limited to: drowsiness, upset stomach, vomiting, stomach pain, depression, lightheadedness, confusion.[3] "Butalbital can result in intoxication that is clinically indistinguishable from that produced by alcohol. Symptoms include sluggishness,

_____

[3]
*See* The American Society of Health-System Pharmacists, Inc., *United States National Library of Medicine, Medline Plus*, http:www.nlm.nih.gov/medlineplus/druginfo/meds/a601009.html, (Last Reviewed September 1, 2008). A copy of this web page is attached to this report and recommendation.

incoordination, difficulty thinking, poor memory, slowness of speech and comprehension, faulty judgment, disinhibition of sexual and aggressive impulses, decreased attention, emotional lability, and an exaggeration of basic personality traits."[4]  The Court notes Dr. Caffrey did not account for the effects of medication when she identified the five moderate limitations Plaintiff had.  In contrast, in identifying multiple severe limitations, Drs. Peck and McCabe noted Plaintiff's intake of medication to control the symptoms of his headaches.

Regarding the ALJ's second error, Plaintiff's mother's testimony was given little weight as "not supported by the objective evidence."  (AR 62).  The entire record seems very consistent with her testimony that Plaintiff has good days and days when he is incapacitated, particularly the most unbiased information in the record, the letter from the receptionist at the chiropractor.

On remand, the ALJ must consider Plaintiff's mother's testimony in light of the other evidence in the record including, Dr. Barnett's medical evidence, the opinion of Dr. Caffrey that Plaintiff cannot manage his own benefits, and the opinions of Drs. Peck and McCabe as to Plaintiff's limitations while on medication.  Dr. Barnett's treatment notes show that Plaintiff suffered from chronic headaches on a twice-a-week to daily basis.  Dr. Barnett prescribed the barbiturate butalbital to alleviate the symptoms of these headaches.  While not acknowledging Plaintiff takes medication, Dr. Caffrey opined that Plaintiff could not manage his own benefits.  Drs. Peck and McCabe found multiple severe limitations and noted the significance of Plaintiff's medication.  This evidence supports Plaintiff's mother's testimony that Plaintiff is not functional, is anti-social, and requires assistance when he has a severe headache and takes his medication.  Plaintiff's mother's testimony about his daily activities when he does not have a headache should be considered in the context of how often Plaintiff has a severe headache requiring medication.

---

[4] Stephen D. Silberstein, M.D. & Douglas C. McCrory, M.D., *Butalbital in the Treatment of Headache: History, Pharmacology, and Efficacy*, Headache. 2001 Nov-Dec; 41(10):953-967 at 955, Jefferson Headache Center, Thomas Jefferson University Hospital, Philadelphia, PA 19107.

Third, the ALJ must provide clear and convincing reasons for discounting Plaintiff's credibility about his sensitivity to light or accept his testimony on the matter. Both Plaintiff and his mother provided detailed testimony about Plaintiff's sensitivity to light. If the ALJ credits Plaintiff's sensitivity, that photosensitivity should then be a limitation presented to a vocational expert to determine Plaintiff's ability to work.

Fourth, the ALJ places great weight on the lack of continued treatment. There is no indication in the record that organic brain damage is curable. The record is clear that the only relief Plaintiff has ever obtained comes from the barbiturate butalbital. He tried three different anti-depressants, but in each instance could not continue with the medication because of adverse side effects. We might speculate that Plaintiff could try safer or better treatment options, but the record is clear that Plaintiff has determined what he believed is his best treatment option for chronic debilitative headaches. Continuing with the same course of treatment for thirteen years is not a lack of seeking treatment.

On remand the ALJ cannot discredit Plaintiff's testimony, his mother's testimony, or the opinions of his examining physicians by stating that Plaintiff has not sought treatment appropriate for his alleged symptoms. The record shows Plaintiff has seen a treating physician complaining consistently of chronic headaches, Plaintiff has taken a barbiturate regularly to combat the symptoms of his headaches, and Plaintiff has not worked since 1997. All this evidence shows effort on the part of Plaintiff to address his organic brain damage and the secondary chronic headaches. On remand, the ALJ may require or the Plaintiff may on his own, provide supplementary medical records or other evidence to show if and how Plaintiff is addressing the symptoms of his impairments.

Fifth, Plaintiff's activities must be assessed in the proper context on remand. The record shows that Plaintiff's activities, ability to interact with others, and overall ability to function are directly linked to whether or not he has a severe headache that requires medication.

As discussed <u>supra.</u> the ALJ should clarify how frequently Plaintiff has severe headaches requiring medication. The ALJ must consider the evidence provided by Plaintiff and Plaintiff's mother regarding Plaintiff's inability to be functional when he has the headaches and takes the medication. The ALJ must also consider the other evidence in the record including the letter from the chiropractor's office stating that Plaintiff often showed up for his appointments under the influence of medication, Drs. Peck and McCabe's opinions about Plaintiff's severe limitations due, in part, to his medicated state, and Mr. Goguen's opinion that Plaintiff's multiple moderate limitations made him unable to work.

Finally, the Magistrate Judge recommends the ALJ be required to consider other evidence in the record which generally supports Plaintiff's position on all five of the alleged errors. For instance, the ALJ gave "substantial weight" to Dr. Caffrey's opinion and little weight to the opinion of Drs. Peck and McCabe "based on the less than credible information and history by the claimant." (AR 62). This is based on the dichotomy between Dr. Caffrey, who found Plaintiff more interpersonally appropriate than expected (AR 60), whereas Peck and McCabe described Plaintiff as "an overgrown complaining, unhappy, disheveled individual who has difficulty answering direct questions." (AR 354). The record is clear that Plaintiff has good days and bad days. The issue is how many bad days compared to good days. It is error to credit one expert's opinion over the other based primarily on different presentation, particularly where the negative presentation is more consistent with the record as a whole and the ALJ's finding that Plaintiff would best work in an environment "requiring brief, superficial, and intermittent contact with co-workers and the general public." (AR 58). Furthermore, the inconsistency in Dr. Caffrey's test results is never explained and Dr. Caffrey never considers the side effects of Plaintiff's medication. Conversely, the report of Drs. Peck and McCabe is much more detailed and includes more references to the medical record.

Also concerning to this Court, the ALJ adopts Dr. Schonbrun's opinion over Dr. Goguen's report, even through Dr. Schonbrun identified dishwasher as a possible job, a job

so obviously inappropriate because of noise, machinery, light, confined space and contact with people that the Commissioner no longer suggests in his briefing that dishwasher is an appropriate job. Dr. Goguen's opinion that five moderate limitations must be considered as a composite, not independently, in terms of the potential impact on successful chance for employment was given little weight by the ALJ.

Finally, the ALJ gave no consideration to Dr. Caffrey's conclusion that Plaintiff could not manage his own benefits. This troubling conclusion requires consideration by the ALJ on remand. Also, the ALJ gave conclusive weight to the opinions of Dr. Caffrey and Dr. Schonbrun, except Dr. Caffrey's conclusion that Plaintiff cannot handle his benefits, and little weight to all evidence introduced by Plaintiff. The record does not support those factual determinations.

**III. RECOMMENDATION**

The Magistrate Judge recommends that the District Court, after its independent review, GRANT Plaintiff's motion and REMAND this case with the instructions outlined under the remedy section of this report and recommendation. The ALJ's decision is not supported by substantial evidence and free of legal error.

Pursuant to 28 U.S.C. § 636(b), any party may serve and file written objections within fourteen (14) days of being served with a copy of the report and recommendation. If objections are not timely filed, they may be deemed waived. The parties are advised that any objections filed are to be identified with the following case number: **CV 08-674-RCC.**

DATED this 15th day of June, 2010.


**CHARLES R. PYLE**
**UNITED STATES MAGISTRATE JUDGE**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
**<u>ATTACHMENT ONE</u>**
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Drug Information: Acetaminophen, Butalbital, and Caffeine

URL of this page: http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601009.html

(a set a mee' noe fen) (byoo tal' bi tal) (kaf' een)

## Why is this medication prescribed?

This combination of drugs is used to relieve tension headaches.

This medication is sometimes prescribed for other uses; ask your doctor or pharmacist for more information.

## How should this medicine be used?

The combination of acetaminophen, butalbital, and caffeine comes as a capsule and tablet to take by mouth. It usually is taken every 4 hours as needed. Follow the directions on your prescription label carefully, and ask your doctor or pharmacist to explain any part you do not understand. Take acetaminophen, butalbital, and caffeine exactly as directed. Do not take more than six tablets or capsules in 1 day. If you think that you need more to relieve your symptoms, call your doctor.

This medication can be habit-forming. Do not take a larger dose, take it more often, or for a longer period than your doctor tells you to.

## What special precautions should I follow?

Before taking acetaminophen, butalbital, and caffeine,

- tell your doctor and pharmacist if you are allergic to acetaminophen, butalbital, caffeine, or any other drugs.
- tell your doctor and pharmacist what prescription and nonprescription medications you are taking, especially anticoagulants ('blood thinners') such as warfarin (Coumadin), antidepressants, antihistamines, pain medications, sedatives, sleeping pills, tranquilizers, and vitamins. Many nonprescription pain relievers contain acetaminophen. Too much of this drug can be harmful.
- tell your doctor if you have or have ever had liver disease, porphyria, or depression.
- tell your doctor if you are pregnant, plan to become pregnant, or are breast-feeding. If you become pregnant while taking this medication, call your doctor.
- you should know that this drug may make you drowsy. Do not drive a car or operate machinery until you know how this drug affects you.
- remember that alcohol can add to the drowsiness caused by this drug.

## What special dietary instructions should I follow?

Acetaminophen, butalbital, and caffeine may cause an upset stomach. Take this medicine with food or milk.

## What should I do if I forget a dose?

Take the missed dose as soon as you remember it. However, if it is almost time for the next dose, skip the missed dose and continue your regular dosing schedule. Do not take a double dose to make up for a missed one.

## What side effects can this medication cause?

Acetaminophen, butalbital, and caffeine may cause side effects. Tell your doctor if any of these symptoms are severe or do not go away:

- drowsiness
- upset stomach
- vomiting
- stomach pain
- depression
- lightheadedness
- confusion

If you experience any of the following symptoms, call your doctor immediately:

- skin rash
- itching
- difficulty breathing

If you experience a serious side effect, you or your doctor may send a report to the Food and Drug Administration's (FDA) MedWatch Adverse Event Reporting program online [at http://www.fda.gov/Safety/MedWatch] or by phone [1-800-332-1088].

## What storage conditions are needed for this medicine?

Keep this medication in the container it came in, tightly closed, and out of reach of children. Store it at room temperature, away from excess heat and moisture (not in the bathroom). Throw away any medication that is outdated or no longer needed. Talk to your pharmacist about the proper disposal of your medication.

## In case of emergency/overdose

In case of overdose, call your local poison control center at 1-800-222-1222. If the victim has collapsed or is not breathing, call local emergency services at 911.

## What other information should I know?

Keep all appointments with your doctor.

Do not let anyone else take your medication. This medication is a controlled substance. Prescriptions may be refilled only a limited number of times; ask your pharmacist if you have any questions.

It is important for you to keep a written list of all of the prescription and nonprescription (over-the-counter) medicines you are taking, as well as any products such as vitamins, minerals, or other dietary supplements. You should bring this list with you each time you visit a doctor or if you are admitted to a hospital. It is also important information to carry with you in case of emergencies.

# Brand name(s):

- Amaphen®
- Anoquan®
- Butace®

- Endolor®
- Esgic®
- Fioricet®

- Medigesic®
- Repan®

Last Reviewed - 09/01/2008



American Society of Health-System Pharmacists, Inc. Disclaimer - http://www.nlm.nih.gov/medlineplus/ashpdisclaimer.html

AHFS® Consumer Medication Information. © Copyright, 2010. The American Society of Health-System Pharmacists, Inc., 7272 Wisconsin Avenue, Bethesda, Maryland. All Rights Reserved. Duplication for commercial use must be authorized by ASHP.